**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JAVIER GARCIA,<br>Defendant. | Case No.  15-cr-00288-BLF-1<br><br> [Re:  ECF 25] |
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JAVIER GARCIA,<br>Defendant. | Case No.  10-cr-00301-BLF-4<br><br> [Re:  ECF 372]<br><br>**ORDER DENYING DEFENDANT'S<br>MOTION TO SUPPRESS** |

Defendant Javier Garcia contends that on January 18, 2015, police officers violated his constitutional rights by illegally entering and searching his residence without a warrant, by arresting him inside his home, and by interrogating him at the police station without ensuring that he understood his *Miranda* rights. Mot., ECF 25. On the basis of those asserted violations, Defendant moves to suppress evidence discovered during the searches of his residence and person, as well as all statements he made to the police that day. *Id.* For the reasons set forth below, the Court DENIES Defendant's Motion to Suppress.

## I.      BACKGROUND

The Court held a hearing on this motion on March 29, 2016. At that hearing, Officer Richard Lopez credibly testified to his knowledge of the following facts.

Officer Richard Lopez has been an officer with the Salinas Police Department for nearly

United States District Court
Northern District of California

thirteen years. In October 2011, Officer Lopez and his partner, Officer Raul Rosales, were assigned to the Community Alliance for Safety and Peace, a neighborhood-based policing special assignment. They were assigned exclusively to the neighborhood where the events described below took place. This neighborhood includes the location where Defendant was arrested, 513 Fremont Street. The neighborhood is known for its high incidence of gang-related activity, including drug trafficking, weapons violations, violence against persons, and burglaries. *See* Hearing Transcript at 11:15-12:5. The purpose of the officers' assignment was to enhance public safety in that neighborhood.

By January 18, 2015—when the events described below occurred—Officers Lopez and Rosales had been patrolling the neighborhood for more than three years and had grown familiar with the types of crime that are most prevalent there, as well as the practices and behaviors common to gang members and other criminals operating there. *See* Lopez Decl. ¶ 3, ECF 27-1. That day, the officers decided that to cover the neighborhood most effectively, Officer Lopez would patrol on his bicycle while Officer Rosales patrolled in a marked patrol car. Both were wearing their police uniforms.

While they were separated, Officer Lopez stopped to make a cell phone call in front of 513 Fremont Street, which is comprised of multiple structures with a common parking area. The individual units are small. As Officer Lopez was standing there, he heard Officer Rosales over his radio. Officer Rosales stated that he had been attempting to contact two individuals when one ran away, holding on to his waistband. *See* Hearing Transcript at 13:6-12. Officer Rosales stated that he was in foot pursuit of the individual, who was headed toward Officer Lopez.[1]

Seconds later, the individual, later identified as Alfonso Nevarez, ran by Officer Lopez,

---

[1] Defendant offers additional facts regarding Rosales' interaction with these individuals in an attempt to argue that Rosales should not have approached or pursued this individual to begin with. However, as discussed below, Defendant lacks standing to challenge the officers' treatment of those individuals. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 134 (1978). Because the Court considers only whether or not Defendant's rights were violated by the search of his residence, the Court considers only the facts that were known to the officers who entered the residence and conducted that search. *See United States v. Black*, 482 F.3d 1035, 1040 (9th Cir. 2006) (whether the actions of police are objectively reasonable must be judged based on the circumstances known to them at the time of the action).

who did not see any weapon on him. When Nevarez ran past, Officer Lopez dropped his bike and drew his gun. He gave chase and ordered Nevarez to stop, but Nevarez ignored these commands. Officer Lopez then saw Nevarez run through the metal screen door at the front of Unit 10 of 513 Fremont Street. Nevarez did not use a key and slammed the door behind him.

Officer Lopez ceased his pursuit and held back, stopping about 15 to 20 feet from the entry of Unit 10. Officer Rosales, still chasing Nevarez, arrived about a minute later and the two officers agreed that Officer Lopez would watch the front door while Officer Rosales went to the back of the unit to ensure that Nevarez did not escape from there. Officer Lopez remained close to the unit, between the sidewalk and the front entrance. At least one window faced Officer Lopez from Unit 10. The building is not made of a material that would prevent bullets from going through the walls. *Id.* at 28:15-22, 34:8-19.

Multiple individuals approached Officer Lopez while he was standing outside. First, a small boy emerged from the area of the unit. Officer Lopez asked the boy if he lived in the unit and the boy replied affirmatively. Officer Lopez then asked the boy if he knew who the individual was who had run into the house, to which the boy replied, "Poncho was the one that ran in." When asked for the individual's real name, the boy repeated "Poncho." After the brief exchange, Officer Lopez directed the boy to get out of the way and a woman standing nearby called the boy over to her. Shortly thereafter, an older woman exited from the front door of Unit 10. She appeared scared and was shaking. *Id.* at 15:5-22. Officer Lopez testified that he may have asked her whether anyone else was inside the unit and definitely directed her to move away from the door and out of any potential line of fire. *Id.* at 15:19-22, 36:2-15.

Within five minutes of when Officers Lopez and Rosales had last seen each other, Officer Rosales informed Officer Lopez by radio that he had apprehended the suspect in a nearby backyard and taken him into custody. The suspect had exited Unit 10 through a small bathroom window at the back of the unit. The Government provided the Court with a photograph of the back of the unit, including this window, which was entered as Exhibit 1.

Officer Lopez stayed at his position with his gun drawn, and continued to direct bystanders to stay away. He waited for other officers to arrive. Within a minute, Sergeants Cornelison and

Ross arrived. The three officers discussed whether or not to enter the unit without a warrant and decided to enter to sweep for other people. Officer Lopez acknowledged that the only justification for the sweep he listed in his police report was to check for injured persons, but he also testified that at the time he believed a sweep was necessary for officer safety reasons. *Id.* at 39:18-24, 65:12-24.

### A.  Entry, Sweep, Search, and Arrest

The two sergeants entered first and Officer Lopez followed with his gun drawn. The sergeants encountered a man, later identified as Defendant Javier Garcia, as he was coming out of the bathroom. Defendant told them he had been asleep and the officers observed creases on his face consistent with that story. In the declaration filed in support of this motion, Defendant states that the officers had their guns drawn. Garcia Decl. ¶ 7, ECF 26. They ordered him to put his hands up and he complied. At that point, the officers handcuffed him and took him outside the unit. *See* Hearing Transcript at 42:15-21; Garcia Decl. ¶ 7. Another officer stayed outside with Defendant while Officer Lopez continued the sweep with the sergeants. Officer Lopez testified that they completed the sweep within a matter of seconds, and then exited the unit. *See* Hearing Transcript at 42:25-43:1, 45:16-25, 62:1-11.

At that point, Defendant was sitting outside. The officers proceeded to determine his identity by asking him and searching through databases. Once they determined Defendant's identity, an officer conducted a records check, which revealed that Defendant was on federal supervised release with a search condition. *Id.* at 19:10-15.

In light of the search condition, the officer searched Defendant and Officer Lopez went back inside Unit 10 to conduct a full search. *Id.* at 19:14-17. During that search, Officer Lopez found a wallet, keys, and bags of what appeared to be methamphetamine all grouped together under a sleeping pad on the floor in the living room. Inside the wallet, Officer Lopez discovered identification belonging to Defendant as well as two additional bindles of what appeared to be methamphetamine. *Id.* at 19:23-20:1. On direct examination, Officer Lopez testified that it was at this point that the other officers placed Defendant under arrest. *Id.* at 20:5-6.

### B.  Post-Arrest Interview

United States District Court
Northern District of California

1  Defendant was then transported to the police station, where Officer Lopez interviewed

2  him. The Government provided the Court with an audio recording and transcript of the interview.

3  Officer Lopez opened the interview with a brief greeting and then stated, "Let me start by

4  reading your rights. You have the right to remain silent." Interrogation Transcript at 2:6-8. As he

5  began the second *Miranda* right, Defendant interrupted, asking, "What are you reading my rights

6  for?" Officer Lopez responded, "Because you're under arrest right now." Defendant asked, "For?"

7  and Officer Lopez responded, "Possession of narcotics for sale." Defendant reacted with surprise,

8  stating "You'll pull a crazy on that one." *Id.* at 2:10-14.

9  Before Officer Lopez could continue reading the *Miranda* rights, Defendant persisted in

10  explaining that he had no drugs on his person, was asleep when his nephew ran inside, and didn't

11  know what was going on. Garcia stated, "You're telling me I'm arrested for some reason that I got

12  nothing about." *Id.* at 2:15-15. As Defendant testified at the hearing, "[h]e stated the *Miranda*

13  rights and I kept interrupting like, 'Why am I getting arrested?'" Hearing Transcript at 81:7-9.

14  At this point, Officer Lopez attempted to read Defendant his rights again, responding,

15  "Okay. Well, I can explain that to you. But let me read you your rights so that there's no confusion

16  about that when we go to court or anything like that." Defendant responded, "Well, there's a big

17  confusion because you got me here for some reason that I don't know." Officer Lopez answered,

18  "Well, that's why I'm trying to explain to you that the reason you're here is . . . you're under arrest

19  because when I went inside the building I found your wallet right next to three bindles of

20  methamphetamine." At this point, Defendant responded, "Uh-huh" and Officer Lopez proceeded,

21  "And inside your wallet there were two bindles of methamphetamine as well. Okay? All right. So

22  you have the right to remain silent." Defendant responded, "Okay" and Officer Lopez stated

23  Defendant's full *Miranda* rights.[2] *See* Interrogation Transcript at 3:1-23.

24  Officer Lopez then asked, "Do you understand each of these rights I've explained to you?"

25  Defendant answered, "No." *Id.* at 3:24-4:1. Asked which one he did not understand, Defendant

26

---

27  [2] In addition to the right to remain silent, Lopez told Defendant, "Anything you say can and will
be used against you in a court of law. You have the right to talk to a lawyer and have a lawyer

28  present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be
appointed to represent you before any questioning if you wish one."

responded, "None of them." Officer Lopez stated his intention to read the rights again, but Defendant stopped him, stating, "I'm not gonna – you don't have to read nothing 'cause I . . . don't understand nothing what you guys are doing. . . . I don't understand nothing. Those bindles are not mine. I don't know how the f--- they got there." *Id.* at 4:2-11.

In a declaration submitted with his motion, Defendant explained that he did not understand any of his rights and did not understand why he was being charged with possession of a controlled substance. Garcia Decl. ¶ 11. Defendant stated that Officer Lopez "never dealt with my lack of understanding and never ask me if I was waiving my *Miranda* rights. I never told him that I understood or was waiving my rights or that I intended to waive them." *Id.* ¶ 12.

At the hearing, Defendant also testified about his confusion on January 18. Defendant repeatedly testified that he was confused when the rights were read to him because he did not understand why he was arrested. *See, e.g.,* Hearing Transcript at 80:1-14, 80:24-81:4. When pressed as to whether or not he understood the rights themselves, Defendant responded "No. Because there could be meanings to those. As when you read me the *Miranda* rights every word is a meaning. That's why I interrupted by stating that I didn't understand that. And he never clarified what the meanings were to each of the words that he's stating." *Id.* at 82:8-19. However, when asked what Officer Lopez meant when he told Defendant he had the right to remain silent, Defendant explained that he "could remain silent or . . . make [a] statement. . . It's a right that you can be silent or not." *Id.* at 82:20-25. Defendant then stated, "What I could understand, I heard. And that's why I kept interrupting stating that I didn't understand why he was reading the [rights]." *Id.* at 83:1-5.

The police station interview proceeded after Defendant's statement that he did not understand. Officer Lopez asked Defendant a series of questions about the incident at 513 Fremont Street and Defendant readily responded. Defendant identified the members of his household: his nephew, the young boy, the boy's mother (Defendant's niece), and his nephew's mother (Defendant's sister). *See* Interrogation Transcript at 6:5-8:10. Officer Lopez explained to Defendant that he had found Defendant's wallet, keys, and three bindles placed together. Officer Lopez then stated, "Okay? So that's why . . . right now you're under arrest for that. . . . So that's

1   why I was reading your rights, that's why you're under arrest, that's why we're going through the
2   whole process." *Id.* at 10:23-11:9.

3       Following that explanation, Officer Lopez asked Defendant about the bindles found inside
4   Defendant's wallet and Defendant stated, "The little ones in my wallet, those are personally
5   mine." *Id.* at 11:18-19. He admitted to using methamphetamine "here and there." *Id.* at 11:23. He
6   disclaimed ownership of the other bindles, found outside his wallet.

7       When asking who might have left the bindles there, Lopez followed up by stating: "It's
8   one of those things. 'Cause who's the one that's on federal probation, who's looking to get locked
9   up again for another three years. It's you, not me." *Id.* at 18:13-16. Defendant responded, "Well,
10  that's why I'm letting you know . . . the circumstances . . . how it is now until then. . . . I got
11  nothing to beat around. I already know what's going on, you know what I mean? . . . I'm not
12  trying to put myself through more danger than I am." *Id.* at 18:17-24.

13      After a few more questions regarding whether or not the bindles outside of Defendant's
14  wallet belonged to Defendant, Officer Lopez attempted to wrap up the interview. He told
15  Defendant, "So you're being charged with possession for sales. And I believe tied with that might
16  also be child endangerment." *Id.* at 21:9-11. Defendant responded with disbelief. He asked,
17  "You're trying to say that I got charged with endangerment." Officer Lopez responded, "Yes," and
18  Defendant followed up, "And for sales?" Officer Lopez again responded "Yes" and Defendant
19  said, "Oh, hell, no." *Id.* at 21: 16-23. They proceeded to discuss alternative ways that the
20  methamphetamine could have appeared beside Defendant's belongings and also walked through
21  the officers' timeline of the afternoon's events again. Following that, the interview concluded.

22      At the hearing, Defendant testified that he had been arrested six or seven times prior to the
23  arrest on January 18, 2015. *See* Hearing Transcript at 78:1-5. He testified that he does not know
24  what the *Miranda* warnings are, but that he remembered police officers in prior arrests telling him
25  that he has the right to remain silent, the right to an attorney, and that an attorney would be
26  provided for him if he could not afford one, but not that anything he said could be used against
27  him in court. *Id.* at 78:11-14, 79:2-13.

28      With regard to his January 18 arrest, Defendant stated that he did not recall the prior arrests

United States District Court
Northern District of California

where the *Miranda* warnings were read to him. Defendant testified that Officer Lopez read him each of the *Miranda* rights at the police station, *id.* at 80:1-8, but later stated that Officer Lopez never finished reading the rights because Defendant kept interrupting to ask why he was arrested. *Id.* at 81:10-12 and 83:11-19. As noted above, the transcript of the interrogation establishes that Officer Lopez stated the entirety of Defendant's *Miranda* rights.

In his testimony, Defendant also explained several of the *Miranda* warnings in his own words. He explained that the right to remain silent provides "an option . . . either to stay silent or [make] a statement if I wish." *Id.* at 79:14-21. He described the right to a lawyer as follows: "[t]hat if I didn't have any money to get one, they will appoint one for me." *Id.* at 79:22-25.

## II.     DISCUSSION

Defendant argues that the police officers violated his constitutional rights in four ways: by unreasonably pursuing his nephew, by entering his home without a warrant, by arresting him inside his home, and by interrogating him without a waiver of his *Miranda* rights. On the basis of these constitutional violations, Defendant moves to suppress all evidence found on him and in his residence, as well as all statements he made to the police on January 18, 2015. The Government responds that Defendant's rights were not violated and that exclusion, which it characterizes as an "extreme sanction," is therefore unwarranted. Opp. at 4, ECF 27 (quoting *U.S. v. Leon,* 468 U.S. 897, 916 (1984)). The Court considers each alleged constitutional violation in turn.

### A.     Stop of Nevarez

First, Defendant asserts that Officer Rosales lacked reasonable suspicion to attempt to stop the two individuals, including Mr. Nevarez, and that, had Officer Rosales not approached Mr. Nevarez, the officers never would have entered Unit 10, discovered Defendant, and searched his person and residence. Mot. at 6-9. The Government responds that Defendant lacks standing to move for suppression on this ground, as it challenges the officers' alleged violation of someone else's constitutional rights. Opp. at 4-5.

The Court agrees with the Government. "[R]ights assured by the Fourth Amendment are personal rights, and they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390

United States District Court
Northern District of California

U.S. 377, 389 (1968). *See also Alderman v. United States*, 394 U.S. 165, 174 (1969) ("the general rule [is] that Fourth Amendment rights are personal rights, which . . . may not be vicariously asserted."). The Supreme Court explains this well-established rule as follows: "since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978) (internal citations omitted); *see also United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005) (holding that individual lacks standing to suppress gun found in another individual's car).

Applying that reasoning here, the Court finds that the officers' pursuit of Nevarez did not violate any of Defendant's rights and Defendant therefore lacks standing to challenge that pursuit. Therefore, the evidence cannot be suppressed on this ground.

However, this does not determine whether or not the officers' entry into Defendant's residence violated any of Defendant's rights. That is a separate question to which the Court now turns.

### B.     Entry Into Residence

Defendant next contends that the officers' entry into his residence violated his Fourth Amendment rights because they did not have a warrant and no exigent circumstance or emergency existed to justify their entry without a warrant. Mot. at 9. Defendant argues that the Court must therefore exclude any evidence discovered as a result of the entry. *Id.* at 9-10. The Government responds that the emergency exception applies. Opp. at 7-9.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980). *See also Silverman v. United States*, 365 U.S. 505, 511 (1961) ("At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.")

As a result, it is "a guiding principle that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 585. Officers can overcome this

9

presumption either with "probable cause and exigent circumstances or an emergency sufficient to justify the entry." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 1401 (2015); *see also U.S. v. Struckman*, 603 F. 3d 731, 738 (9th Cir. 2010).

The exceptions are "'narrow and their boundaries are rigorously guarded.'" *Sandoval*, 756 F. 3d at 1161 (quoting *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009)). To invoke either exception, "[t]he police must show that a warrant could not have been obtained in time, and must demonstrate specific and articulable facts to justify the finding of either exigent circumstance or emergency." *Sandoval*, 756 F. 3d at 1161 (internal citations omitted). At the same time, when determining whether either exception applies, a court must "assess officers' actions 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* at 1163 (quoting *Ryburn v. Huff*, —— U.S. ——, 132 S.Ct. 987, 992 (2012). In this context, an action is reasonable "regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (internal citation omitted).

To assess whether the Government has satisfied the emergency exception, the Ninth Circuit uses "a two-pronged test that asks whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). "Under that test . . . if law enforcement, while responding to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would be found." *Id.* (internal citation omitted).

The Government argues that an emergency situation justified entry here—the need to go inside to check for injured persons requiring medical assistance—and that the officers were justified in entering to conduct a protective sweep after Nevarez's arrest. The Court begins with the Government's first argument that the officers were justified in entering Defendant's residence to administer emergency aid.

### 1.   Emergency Aid

"The emergency aid exception typically has been understood to permit law enforcement officers to enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City*, 547 U.S. at 403 (internal citations omitted). It "stems from the police officers' 'community caretaking function' and allows them 'to respond to emergency situations' that threaten life or limb." *Struckman*, 603 F.3d at 738 (quoting *United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir. 2000)).

The Government argues that the exception applies here because the officers entered Defendant's residence in order to check for any individuals who may have been injured during Mr. Nevarez's time inside. Opp. at 7-9. To support its position, the Government offers two cases where it contends the Ninth Circuit found that officers' warrantless entries into residences to check for injured individuals were justified on the basis of comparable or even less information.

First, the Government points to *U.S. v. Black,* 482 F. 3d 1035 (9th Cir.), which held that two police officers were justified in entering an individual's apartment without a warrant on the basis of the following facts: The individual's ex-girlfriend had placed a 911 call stating that he had beaten her that morning, that he had a gun, and that she intended to return in the afternoon to retrieve her belongings. *Id.* at 1039. She told the dispatcher that she would wait for officers outside the apartment in her white pick-up truck. *Id.* at 1039. When the first officer arrived, he saw no sign of the woman or the car. *Id.* He alerted the second officer, who stopped by the place from which the woman had made her call to check for her there. *Id.* Seeing no sign of her, he proceeded to the individual's apartment. *Id.* The officers discovered the individual by the back entrance. *Id.* He identified himself as Mr. Black and admitted knowing that the police were investigating a domestic violence call, but denied knowing where his ex-girlfriend was or that he lived in the apartment. *Id.* After the individual grew agitated, one officer patted him down for weapons and searched his pockets with his consent. *Id.* During that search, the officer discovered the key to the apartment, which he used to enter the unit and make a quick sweep to see if anyone was inside. *Id.*

In light of those facts, the Ninth Circuit held that the officers "were justified in their entry because they feared that [the ex-girlfriend] could have been inside the apartment, badly injured

and in need of medical attention." *Id.* at 1039. The court found that the officers' belief was reasonable because "what the officers knew at the time was that [the ex-girlfriend] said she would meet them at the scene, she was not there but her attacker was, . . . he denied living in the apartment though he had a key to it" and he admitted that he knew the officers were investigating a domestic violence call. *Id.*at 1040.[3]

The court explained that "[e]rring on the side of caution is exactly what we expect of conscientious police officers." *Id.*  In the context of a "'welfare search' where rescue is the objective, rather than a search for crime[, w]e should not second-guess the officers objectively reasonable decision." *Id.*

The Government next offers *United States v. Snipe*, 515 F. 3d 947 (9th Cir. 2008) which found that "the officers' initial [warrantless] entry was justified" on the basis of the following facts: the police department received a call at approximately 5 a.m. on January 1 from an unidentified "very hysterical sounding" male, who screamed something along the lines of "get the cops here now." *Id.* at 949. The call was then disconnected and the dispatcher directed two officers to report to the residence the caller had identified. *Id.* One of the officers, who happened to live down the street, noticed a vehicle he did not recognize parked in front of the house and an individual he did not recognize walking into the house. *Id.* Both officers noted that the lights were on, in contrast to the other homes in the area. *Id.* The officers approached the house and noticed that the door was partially ajar. They knocked and the force apparently pushed the door open. *Id.* Both officers then stepped inside, where they discovered a group of individuals. *Id.* The officers asked who was hurt and described the phone call that had led them there. *Id.* The individuals denied that anyone was hurt and invited the officers to look around. *Id.* One officer checked the entire residence, save for a locked room, and determined that there was no emergency. *Id.* at 949-50.

The Ninth Circuit determined that "the officers had an objectively reasonable basis for believing there was an immediate need to protect individuals at the . . . residence from serious

---

[3] This case was decided before *Snipe* established the second prong, which considers the reasonableness of the scope and manner of entry, and therefore does not assess that prong.

United States District Court
Northern District of California

harm" because they were responding to a hysterical call asking for the police to come immediately, the call was placed at 5 a.m., an officer who lived nearby did not recognize the car or individual he saw by the residence, and the residence looked suspicious because the front door was ajar and the lights were on. *Id.* at 953-54.

The Ninth Circuit rejected the appellant's position that the police should have done something to verify the caller's identity or the facts at the residence before entering. *Id.* at 953. The Court explained that "such a requirement would dramatically slow emergency response time, and would therefore be at odds with the purpose of the emergency doctrine." *Id.* (internal quotation omitted). "The possibility that immediate police action will prevent injury or death outweighs the inconvenience we suffer when the police interrupt our ordinary routines in response to what turns out to be a non-emergency call." *Id.* at 954.

In addition, the Ninth Circuit found that the manner of entry was reasonable because the officers knocked and announced their presence, identified themselves, and said they were responding to an emergency call. *Id.*  The court similarly found the scope to be reasonable because it was "confined to the areas of the house likely to include individuals in harm's way." *Id.*

The Government contends that, just as in *Black* and *Snipe,* the officers here had an objectively reasonable basis for believing there was an immediate need to protect individuals at the residence from serious harm. Opp. at 8-9. The Government argues that the officers had even more justification for entering Unit 10 than did the officers in *Black.*  In this case, the officers had no reason to believe that the unit was empty. They had not been informed that there was no one else inside, and there was no indication—such as a missing car—that would suggest that to be the case. Instead, at the time of entry, the officers knew that they had been in pursuit of a suspect who entered a residence that they did not know to be his and who escaped through a window in the back; they believed he might be armed; a frightened and shaken woman had emerged from the unit minutes after the suspect ran in and minutes before the officers entered; and the events took place in an area known for gang activity and other violent crime. *See* Hearing Transcript at 11:15-18, 13:6-12, 13:16-14:11, 15:9-18, 15:23-16:1, 18:18-22. On this basis, the Government argues, the officers were justified in believing that entry was necessary.

United States District Court
Northern District of California

As for the second prong of the test set forth in *Snipe*, the Government argues that the entry's scope and manner were reasonable to meet the need of rendering aid: the officers conducted a brief sweep to locate other occupants. At the hearing, Officer Lopez distinguished this sweep, which took seconds, from the full search he conducted later, after he had learned of the search condition to which Defendant was subject. *See* Hearing Transcript at 42:25-43:1, 45:16-25, 62:1-11.

Defendant responds that the warrantless entry was not justified. Defendant offers two cases in support of his position. First, Defendant cites *Sandoval*, in which the Ninth Circuit considered a § 1983 claim that officers violated a family's Fourth Amendment rights by, in relevant part, entering their home without a warrant. In that case, the Government argued that exigent circumstances justified the police's warrantless entry into the appellant's residence—specifically, that they believed the individuals were committing a burglary when they approached the house. Because the Government relies on the emergency exception in this case, which invokes different standards than the exigent circumstance of a crime actively being committed, the Court finds *Sandoval* unpersuasive here. Defendant does not argue otherwise, providing no basis for comparing the facts in *Sandoval* to those before the Court.[4]

In addition to offering case law, Defendant also offers two factual challenges to the Government's position. First, Defendant argues that the officers lacked a reasonable basis for concluding that there was an immediate need to protect others from serious harm because they could have asked the frightened woman who exited whether or not anyone else was inside or injured, but consciously chose not to in order to retain a pretext for warrantless entry. Mot. at 15-16. Defendant contends that such willful ignorance cannot be used to create an exception to the warrant requirement. Reply at 6, ECF 28.

The Government responds to this first factual challenge by stating that the law does not require such additional steps, as they could dramatically slow emergency response time. Opp. at 9.

---

[4] Defendant also relies on *United States v. Nora*, 765 F.3d 1049, but the Court finds that, like *Sandoval*, *Nora*, which focuses on the validity of an in-home arrest, is not instructive on the question of whether the officers' entry into Defendant's residence was proper. The Court considers the legality of Defendant's arrest in the next section.

The Court finds the Government's response persuasive. As the Ninth Circuit explained in *Snipe,* the imposition of an additional requirement to verify concerns about an emergency "may cost lives that could have been saved by an immediate police response." *Snipe*, 515 F.3d at 953. Doing so "would be at odds with the purpose of the emergency doctrine—allowing police to respond to emergency situations in a timely matter." *Id.* (internal citations omitted).

Furthermore, imposing additional verification requirements is particularly unreasonable where, as here, it is unclear that additional investigation would have led to reliable results. In *Black*, for example, the Ninth Circuit found entry was justified to search for an individual even after the police were told that the occupant did not know where she was. Similarly, here, Officer Lopez testified that he could not have relied on the frightened woman's response because, in his experience, people in that neighborhood fear disclosing to officers how many people reside in a particular unit due to the possibility of a breach of contract with their landlord.

Second, Defendant argues that the amount of time that passed between Mr. Nevarez's entry into the unit and the officers' decision to sweep it shows that any exigency that may have existed had abated by the time of entry. Defendant contends that the Government has failed to "show that a warrant could not have been obtained in time." Reply at 9 (quoting *LaLonde v. County of Riverside*, 201 F. 3d 947, 957). In light of Officer Lopez's testimony that the frightened woman exited the unit within minutes of Mr. Nevarez running in and that the officers swept the unit minutes later, this argument is unpersuasive. As discussed above, the officers believed that there was an immediate need to protect others, entered as soon as back-up arrived, and therefore did not have time to obtain a warrant.

Thus, considering the totality of the circumstances, the Court finds that the officers had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm. In particular, the Court is persuaded by the fact that the officers were in pursuit of a suspect, did not know whether he ran into his own home or someone else's, and then saw a frightened and shaken woman emerge from inside. *See* Hearing Transcript at 13:6-12, 13:16-14:11, 15:9-18, 15:23-16:1, 18:18-22. As in *Black,* "[e]rring on the side of caution is exactly what we expect of conscientious police officers" in circumstances such as these.

In addition, the Court finds that the manner and scope of the entry were reasonable to meet the need of emergency aid. The officers were inside for less than a minute and conducted only a visual search for other persons; they did not, for example, look in drawers or under couch cushions. *See* Hearing Transcript at 42:1-11. Accordingly, the entry satisfies *Snipe*'s two-prong test.

### 2.    Protective Sweep

The Government additionally argues that, following Mr. Nevarez's arrest, the officers were justified in entering to conduct a protective sweep. Opp. at 10. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* A protective sweep is permissible under the Fourth Amendment if "the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Id.* at 327-38 (internal citations and quotation marks omitted). Officers have an interest "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.* at 333.

The officers entered Unit 10 after Nevarez was arrested. In this way, the instant case is readily distinguishable from *Sandoval*, which the Court considers again in this section for its analysis of the exigency exception. In *Sandoval*, a § 1983 case, officers came to the plaintiffs' home in response to a "prowler call" but entered the home after observing boys inside who neither matched the physical description of the alleged "prowlers" nor were engaged in activities that appeared illegal. *Id.* at 1162. Given those facts, the Ninth Circuit found that officers failed to meet the exigency exception because their "warrantless entry into the home was not supported by probable cause." *Sandoval*, 756 F. 3d at 1163.

Here, the officers had probable cause based on the arrest of Nevarez. As the Government argues, his arrest provided justification for entering the residence to conduct a protective sweep

1    notwithstanding the fact that he was arrested outside of Unit 10. In support of this position, the

2    Government relies on *Unites States v. Hoyos*, 892 F. 2d 1387 (9th Cir. 1989) (overruled on other

3    grounds by *United States v. Ruiz*, 257 F. 3d 1030 (9th Cir. 2001). In *Hoyos*, the Ninth Circuit

4    found that officers were justified in entering a residence to conduct a protective sweep though the

5    defendant's arrest occurred outside. *Id.* at 1397. The court explained, "If the exigencies to support

6    a protective sweep exist, whether the arrest occurred inside or outside the residence does not affect

7    the reasonableness of the officer's conduct. A bullet fired at an arresting officer standing outside a

8    window is as deadly as one that is projected from one room to another." *Id.*

9         The Government argues that the officers here had a reasonable belief that the area swept

10   harbored an individual posing a danger to them. Opp. at 11. Specifically, the Government points to

11   Officer Lopez's knowledge that Mr. Nevarez, who had run into the unit, may possess a weapon,

12   *see* Hearing Transcript at 13:6-12; the officers' knowledge from training and experience that a

13   suspect fleeing from police will sometimes run to join accomplices or fellow gang members who

14   pose a threat to officers even after the fleeing individual is arrested, *see* Lopez Decl. ¶ 5; and the

15   fact that, following Mr. Nevarez's arrest, officers were standing in the line of fire, *see* Hearing

16   Transcript at 34:8-19.

17        Defendant responds that the officers' entry could not have been justified as a protective

18   sweep because Officer Lopez did not believe, at the time of entry, that officer safety was at issue.

19    The Court finds this argument unpersuasive. At the hearing, Officer Lopez acknowledged that

20   although the only reason for entry he listed in his police report was a welfare check, *see* Hearing

21   Transcript at 39:18-20, he testified that he also believed at the time of the incident that officer

22   safety was a concern. *Id.* at 65:12-24. This testimony is corroborated by the fact that Officer Lopez

23   took precautions to move bystanders away from Unit 10 to insure their safety, while maintaining

24   his own position near the residence. He had his gun drawn during the entirety of the incident and

25   remained concerned about bystanders being in the line of fire. *Id.* at 34:8-19, 60:12-18.

26         More importantly, as Defendant himself notes, the officers' subjective beliefs at the time

27   of entry are irrelevant because the determination is an objective one. *See* Mot. at 16 (citing *United*

28   *States v. Veners*, 539 F.3d 801, 807 (7th  Cir. 2008)). "[T]here must be articulable facts which,

United States District Court
Northern District of California

United States District Court
Northern District of California

taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334.

Defendant relies on *Nora* to argue that such facts were not present here. *Nora* considered whether the warrantless entry into the defendant's home for the express purpose of arresting him violated his Fourth Amendment rights as articulated in *Payton*, which held "that the Fourth Amendment forbids arresting a suspect inside his home unless the police first obtain an arrest warrant or an exception to the warrant requirement applies." *United States v. Nora*, 765 F.3d 1049, 1054 (9th Cir. 2014) (quoting *Payton v. New York*, 445 U.S. 573, 590 (1980)). In *Nora,* the Ninth Circuit found that no exigency justified entry into the home to make the arrest. *Id.* at 1054. But, here, Defendant was unknown to the officers until he was discovered during the sweep following Nevarez's arrest. Thus, unlike in *Nora*, the officers did not enter to search, seize, or arrest; they entered only to secure the safety of themselves and others. *See* Hearing Transcript at 43:3-7.

On the basis of the articulable facts provided, the Court finds that the officers were reasonable and prudent in their belief that a dangerous individual could be inside Unit 10, posing a danger to the officers or others. Specifically, the officers knew that a potentially armed suspect had run into the residence, that a frightened woman had come out, and that both they and the individuals they had directed away from the building could nevertheless be in the line of fire. As discussed above, the Court also finds that the sweep, which lasted seconds and was limited to a visual search, was "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. Thus, the Court finds that the officers' entry was justified not only under the emergency aid exception, but also as a protective sweep conducted out of fear for their own safety.

### C.     Arrest

Defendant next argues that the officers arrested him inside his residence in violation of *Payton*. Mot. at 12. The Government responds that Defendant was arrested outside of his residence and that the high standards for an in-home arrest therefore have no bearing here. Opp. at 12.

United States District Court
Northern District of California

1 The Court agrees with the Government. Having reviewed the evidence, the Court finds that

2 Officer Lopez's testimony was credible and establishes that the events unfolded as follows: The

3 officers discovered Defendant during the sweep, found to be proper above. *See* Hearing Transcript

4 at 18:23-19:5; Garcia Decl. ¶ 7. At that point, the officers handcuffed Defendant for the purposes

5 of officer safety and Officer Lopez escorted Defendant outside. *See* Hearing Transcript at 42:15-

6 21; Garcia Decl. ¶ 7.[5] Defendant then sat outside as the officers identified him and learned of his

7 search condition through a one-to-two minute record check. *See* Hearing Transcript at 19:10-15,

8 47:1-3. The officers searched his person and residence pursuant to the terms of the search

9 condition and discovered marijuana and methamphetamine. *Id.* at 19:14-20:1, 48:18-21. Having

10 found the controlled substances, the officers arrested Defendant. *Id.* at 20:5-6.

11 Thus, the arrest occurred outside, following a legal search that uncovered large amounts of

12 controlled substances. As a result, no *Payton* violation occurred. Accordingly, Defendant's Motion

13 to Suppress the evidence found on his person and in his residence is DENIED.

14 **D.  Post-Arrest Statements**

15 Finally, Defendant seeks to suppress all statements he made while at the police station

16 because, though Lopez informed him of his *Miranda* rights, Defendant indicated that he did not

17 understand them. Mot. at 19-20. Defendant argues that, without possessing an understanding of his

18 rights, he could not possibly have waived them. *Id.* He contends that the questioning therefore

19 violated his Fifth Amendment rights and any answers must be suppressed pursuant to the

20 exclusionary rule. Mot. at 20.

21 "For inculpatory statements made by a defendant during custodial interrogation to be

22 admissible in evidence, the defendant's 'waiver of Miranda rights must be voluntary, knowing, and

23 intelligent.'" *United States v. Binder*, 769 F.2d 595, 599 (9th Cir.1985) (citing *Miranda v.*

24 *Arizona*, 384 U.S. 436, 479 (1966)). "[A] heavy burden rests on the government to demonstrate

25

26

27

28

---

[5] During his cross-examination, Officer Lopez agreed that Defendant was taken into custody in the unit. Id. at 42:10-11. The totality of the circumstances—including Officer Lopez's clear testimony that the arrest occurred outside the unit, following discovery of controlled substances as a result of Defendant's search condition—shows that the Officer used the ambiguous term "in custody" to described placing Defendant in handcuffs, not arresting him.

that the defendant knowingly and intelligently waived his [rights]." *Berghuis v. Thompkins*, 560

U.S. 370, 383 (2010) (quoting *Miranda,* 384 U.S. at 475). A valid waiver depends upon the

"totality of the circumstances including the background, experience, and conduct of defendant."

*United States v. Bernard, S.,* 795 F.2d 749, 751 (9th Cir.1986).

"Waivers of *Miranda* rights need not be explicit; a suspect may impliedly waive the rights

by answering an officer's questions after receiving Miranda warnings." *United States v.*

*Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005), *amended,* 416 F.3d 939 (9th Cir. 2005)

(citation omitted). However, "establish[ing] that a *Miranda* warning was given and the accused

made an uncoerced statement . . . is insufficient to demonstrate 'a valid waiver' of *Miranda* rights.

The prosecution must make the additional showing that the accused understood these rights."

*Berghuis*, 560 U.S. at 384 (internal citations omitted). Specifically, the prosecution must show that

the waiver was "made with a full awareness of both the nature of the right being abandoned and

the consequences of the decision to abandon it." *Id.* at 383-84 (internal citations omitted).

Having reviewed the audio and transcript of the interrogation, the Court finds that Officer

Lopez fully and accurately stated Defendant's *Miranda* rights at the beginning of the interrogation.

Defendant argues, however, that he did not understand why Officer Lopez was reading him his

*Miranda* rights, that he told Officer Lopez that he understood neither the content of his *Miranda*

rights nor why they were being read to him, and that Officer Lopez nevertheless continued to

interrogate him. Reply 15. Defendant contends that Officer Lopez's sole offer to reread the

rights—words Defendant already told him he did not understand—could not have corrected the

problem. *Id.* Because he could not understand his rights, he argues, he could not have waived

them.[6]

The Government responds that Defendant waived the rights by immediately talking about

the evidence found at 513 Fremont Street. Opp. at 14. The Government argues that allowing the

Defendant to now assert that he did not understand his rights simply because he made

---

[6] Defendant also argues that his post-arrest statements followed an unlawful search and must
therefore be suppressed as fruits of a Fourth Amendment violation. Mot. at 17-18. Having found
that the search was lawful, the Court is not persuaded by this argument.

United States District Court
Northern District of California

1   incriminating statements that he wishes to suppress would be a perverse result. *Id.* at 14-15. In

2   addition, the Government contends that Defendant's prior arrests suggest that he has been

3   *Mirandized* several times before. *Id.* at 15.

4        Both parties rely largely on *Berghuis*, in which the Supreme Court held that the defendant

5   validly waived his *Miranda* rights by reading them, confirming to the police that he could read,

6   and eventually making incriminating statements after a long period of minimal speaking. *Berghuis*

7   *v. Thompkins*, 560 U.S. 370, 388-89 (2010). The Supreme Court reached this holding

8   notwithstanding the fact that the defendant declined to sign a form demonstrating that he

9   understood his rights and that the record contained conflicting evidence about whether or not he

10   verbally confirmed his understanding. *Id.* at 375. The Supreme Court determined that this "was

11   more than enough evidence . . . to conclude that [the defendant] understood his *Miranda* rights."

12        In addition, the Government relies on *United States v. Rodriguez-Preciado*, 399 F. 3d 1118

13   (9th Cir. 2005). In that case, the Ninth Circuit upheld the district court's determination that the

14   defendant, who allegedly had difficulty with English, nevertheless understood his rights and

15   knowingly and intelligently waived them. *Id.* at 1128. The court based this determination on the

16   fact that the defendant "indicated that he understood his rights after they were explained to him"

17   and the district court's determination that there was "no indication by any of the officers that [the

18   defendant] had difficulty understanding English nor that the officer had trouble understanding his

19   English." *Id.* at 1127-28.

20        The Government argues that the record here similarly shows that Defendant clearly

21   understood his rights. Opp. at 14-15. The Government contends that, while Defendant may have

22   been confused about *why* he was in custody, he understood the fact that he was in custody, as well

23   as the import of the *Miranda* warnings.

24        Neither party has presented a case in which a defendant explicitly stated that he did not

25   understand the *Miranda* warnings after they were read to him and then went on to answer police

26   questions without hesitation. Instead, the parties offered two distinguishable cases. In *Berghuis*,

27   the defendant refused to sign a form stating that he understood, but the Supreme Court noted that

28   there was conflicting evidence showing that he had verbally affirmed his understanding. In

*Rodriguez-Preciado*, the defendant affirmatively indicated that he understood his rights; though he later challenged that indication by arguing that there was a language barrier—something Defendant does not argue here—the court found no evidence to support his argument.

Though the cases are not directly applicable here, the Court is guided by the principles underlying their holdings. As in *Berghuis* and *Rodriguez-Preciado*, the Court considers the totality of the evidentiary record before it to determine whether or not Defendant understood his rights— and therefore implicitly waived them by speaking without hesitation.

Having reviewed the evidence, the Court agrees with the Government that, while Defendant may have been confused by why he had been arrested, he understood the nature of his *Miranda* rights and the consequences of abandoning them. *See Berghuis*, 560 U.S. at 383-84. This is evident, first, from the interrogation itself. For example, when Officer Lopez first began to recite Defendant's rights, getting only as far as "You have the right to remain silent," Defendant interrupted with, "What are you reading my rights for?" *See* Interview Transcript at 2:10-14. He did not ask "What do you mean?"; instead, he clearly understood that Officer Lopez was "reading [his] rights" and asked, essentially, what basis the officer had to so do. *See* Hearing Transcript at 80:9-11, 80:24-81:4.

Similarly, when Officer Lopez stated "let me read you your rights so that there's no confusion about that when we go to court," Defendant responded "Well, there's a big confusion." But, as before, he did not state "because I don't understand what rights you're talking about" or even simply "What do you mean?" Rather, he followed up with, "because you got me here for some reason that I don't know." *Id.* at 3:1-6. And after Officer Lopez offered to re-read the *Miranda* warnings, Defendant dissuaded him: "you don't have to read nothing 'cause [ ] I don't understand . . . what you guys are doing . . . Those bindles are not mine. I don't know how the f--- they got there." *Id.* at 4:1-11. Again, Defendant expressed confusion about why he had been arrested, but not about the nature of his rights or the consequences of waiving them. In fact, in the midst of Officer Lopez's attempt to explain the *Miranda* warnings, Defendant interrupted so that he could voluntarily discuss the evidence against him.

The tone and pace of the interview further evidence that Defendant knowingly, voluntarily,

and intelligently waived his rights. Immediately after Officer Lopez read him the full *Miranda*

warnings, Defendant spoke without hesitation about the drugs found on his person and in his

residence. Having listened to the audio recording, the Court concludes that the interaction between

Officer Lopez and Defendant had the character of a voluntary and consensual interview.

Finally, Defendant's testimony at the hearing also shows that he understood his *Miranda*

rights and the consequences of waiving them. For example, Defendant testified, "[Officer Lopez]

did read the [rights] to me, which I stated that I didn't understand why I was getting arrested, why

he was reading those *Miranda* rights to me." Hearing Transcript at 80:9-11. Just as he had during

the interrogation, Defendant clearly recalled that Officer Lopez read him his "*Miranda* rights,"

though he "didn't understand why [he] was getting arrested." Similarly, when asked "But as to the

rights themselves, as to the rights that Officer Lopez read to you, your testimony is that you did

not understand why he was reading you the rights, correct?" Defendant responded, "Why I was

getting arrested." The Government followed up, "Why you were arrested at all?" and Defendant

confirmed, "Right."  *Id.* at 80:24-81:4.

Defendant's testimony also established his familiarity with and understanding of the

*Miranda* rights. Defendant testified that he has been arrested six or seven times before, and that he

remembers having the rights read to him on at least one previous occasion. *Id.* at 78:1-5, 78:11-16,

79:2-13. In addition, and quite persuasively, Defendant was able to clearly and correctly explain

the rights in his own words. *Id.* at 79:14-25, 82:20-25. On this basis, the Court finds that the

Government has met its "heavy burden . . . to demonstrate that the defendant knowingly and

intelligently waived his [rights]." *See Berghuis*, 560 U.S. at 383. Accordingly, Defendant's

Motion to Suppress the statements he made to the police on January 18, 2015 is DENIED.

**IT IS SO ORDERED.**

Dated: April 15, 2016

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California